UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:17 CR 435 CDP (JMB) |
| | ) | |
| DENNIS M. SUELLENTROP, JR., | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S POST-HEARING MEMORANDUM FOR MOTION TO SUPPRESS EVIDENCE AND STATEMENTS**

COMES NOW, the United States of America, by and through Jeffrey B. Jensen, United States Attorney for the Eastern District of Missouri, and Robert F. Livergood, Assistant United States Attorney for said District, and for its Response in Opposition to Defendant's Post-Hearing Memorandum for Motion to Suppress Evidence and Statements (Doc. #45), states as follows:

## I.  INTRODUCTION

The defendant has been charged by an indictment with seven counts of production of child pornography and one count of possession of child pornography. The defendant moved to suppress evidence obtained from the search of his cellular phone, and to suppress statements he made to law enforcement officers.

An evidentiary hearing was conducted on February 28, 2018. The following is a summary of the evidence adduced at the hearing, which shows that the Court should not suppress the evidence obtained from defendant's cell phone and should not suppress the statements defendant made to law enforcement officers.

1

## II.  FACTS

Paul Donnelly testified at the evidentiary hearing. He had known the defendant for about a year and lived in a camper parked in defendant's driveway. The trailer was about thirty feet from the house. Tr., p. 32. During the winter, defendant and his girlfriend, Sara Marcher, invited Donnelly to move inside the house because of the cold temperatures, although during the evidentiary hearing conducted in this case, the defendant denied allowing Donnelly to live in the residence. Tr. at 7, 151-2. Defendant testified that on Thanksgiving 2016, defendant and his parents told everyone they must leave the property. Tr. at 154. That included Sarah Marcher, Donnelly and Matt. Tr. at 154. Defendant did not testify whether his daughter "M" was permitted to remain on the property. Defendant acknowledged that Donnelly's trailer remained on his property and that Donnelly lived in the trailer. Defendant never called the police to report that Donnelly was still living there. Tr. at 157.

Donnelly testified that he had permission to be inside the house and had free access to the home. Tr. at 47-8. Donnelly's bedroom was the back room on the right. Tr. at 31. Matt also lived at the house. Tr. at 32. Also living in the residence was defendant's and Sara Marcher's child, "M." "M "was born in June of 2016. Defendant also lived with Sarah Marcher, his girlfriend and the mother of "M."

On December 31, 2016, Sarah Marcher, Donnelly, and a friend went to the River City Casino and then partied and drank the rest of the night. Donnelly returned to the residence around 7:00 a.m. on January 1, 2017. The only people present were defendant and Donnelly. Tr., at 8.

When Donnelly arrived, he found defendant passed out in his bedroom. Donnelly wanted

2

to make a telephone call but did not have a phone. He decided to use defendant's cell phone, an LG cell phone. Donnelly said that defendant had previously permitted Donnelly to use his phone to make calls, use Facebook, and to check his Google account. Tr. at 9-10. However, during the evidentiary hearing defendant denied giving Donnelly permission to use his phone. Tr. at 152. Defendant testified that Donnelly learned the passcode by watching defendant use the phone. *See* tr. at 152. However, even though defendant knew that Donnelly had the passcode for his phone, defendant did not change it, even though he knew how to change it. Tr. at 159. Defendant also knew that Donnelly had used his phone. Tr. at 159-60.

According to Donnelly, defendant knew he was using the LG cell phone. Tr., at 9-10, 37-8. Donnelly believed he had access to most everything on the phone. Tr., at 10. Defendant never told him not to go into the phone. Tr. at 47.

On January 1, 2017, Donnelly went to defendant's bedroom, knocked on the door, and removed the phone from its charger. Tr. 11, 34-5. He used to phone to call his ex-girlfriend and checked on Facebook. Tr., at 11. Afterwards, he got "nosey" and snooped through the contents of the phone. Tr. at 11. Donnelly pulled up pictures on the phone. He started scrolling the pictures in the photo app. Tr. at 15-16. He did not scroll through all of the pictures. Tr. at 17. He enlarged some of the pictures on the phone. Tr. at 16. When he did, he saw child pornography of "baby 'M'". Tr. at 17. In particular, he saw the image depicted in Government's Exhibit 5. He also saw a video of baby "M" as depicted in Government's Exhibit 6.

Not only did he see images of "M" being sexually abused, Donnelly also saw pictures with images penises superimposed on them. Tr. at 18. The pictures appeared to be PhotoShopped.

3

When Donnelly looked at the pictures, no one else was present and law enforcement was not involved. Tr. at 20-21. Defendant was passed out in his room. Tr. at 21.

After Donnelly saw the pictures, he called the house where he believe "M's" mother was at to tell her what he found. Tr. at 40. He talked to Matt (who was the same Matt that resided in defendant's residence). Tr. at 41. Donnelly told Matt what he had found on defendant's phone. Tr. at 42. Matt then told Sara. Tr. at 44.

Afterwards, Matt came over to defendant's residence. Tr. at 43. Donnelly unlocked the LG cell phone and showed Matt what he had found. Tr. at 44, 49. Donnelly went through a couple of images with Matt, but not all of them. Tr. at 50. About fifteen or twenty minutes after Matt arrived, the police also arrived. Tr. at 44. Donnelly did not call the police, but assumed baby M's mother called the police after he told her about the pictures. When the officer arrived, Donnelly showed the officer a picture of baby "M" on defendant's phone. Tr. at 22-3, 45.

At about 1:38 p.m., Deputy Dennis Roberts arrived. Tr. at 52. Deputy Roberts is a member of the Jefferson County Sheriff's Office. Tr. at 51. He was there on a "check the well-being" call, to check the welfare of a child. Tr. at 52, 63. He arrived in a fully marked patrol vehicle but did not have his lights nor siren activated. Tr. at 53. Deputy Roberts was armed and wearing his uniform. Tr. 53. Deputy Roberts' weapon was in his holster. Tr. at 53. Deputy Robert's weapon remained in the holster throughout the incident.

Donnelly walked up to Deputy Roberts and said that he borrowed his roommate's phone to call his girlfriend. Tr. at 53. When he finished talking with his girlfriend, Donnelly said he looked through the phone and found inappropriate images. Tr. at 54. Donnelly told Deputy Roberts that he had seen a picture of "M" with a penis in her face and ejaculation, a picture of a

4

penis inside M's mouth, and a video that depicted the defendant playing with M's butt and vaginal area that also depicted defendant "French kissing" "M." Tr. at 55-6. Donnelly then showed Deputy Roberts the picture. Tr. at 54. Donnelly thrust the LG cell phone at Deputy Roberts' face and put the phone in his hand. Tr. at 67. This was the same picture as in Government's Exhibit 5. Tr. at 54-5. The picture made the officer sick. Tr. at 45. The officer then seized the phone containing the picture. Tr. at 24, 55. Deputy Roberts turned it off and put it in his pocket. Tr. at 55. Donnelly did not object because he "wanted that thing away." Tr. at 24. The pictures made him sick. Tr. at 21.

Deputy Roberts never asked Donnelly to go through the phone. Tr. at 67. Deputy Roberts believed that Donnelly had the authority to show the contents of the phone. Tr. at 67-8. Deputy Roberts did not search the contents of the phone any further before turning it off. *See* tr. at 68.

Deputies Lunsford and Loness arrived to assist. Tr. at 55. They went to the door of defendant's residence and knocked. When no one answered, Donnelly said, "I've been staying there, and I'm allowed to go in." Tr. at 25, *see also* tr. at 56. Donnelly then opened the door and pointed to room where defendant was located. Tr. at 25; *see also* tr. at 56. Deputy Roberts believed that Donnelly had the authority to allow him to go inside the house. Tr. at 68. He gave the officers permission to enter the house. See tr. at 72.

Deputies Lunsford, Loness, and Roberts went inside the residence. All were wearing their police uniforms, and all were armed with the guns in their holsters. Tr. at 57. When they entered, they conducted a security sweep. After determining that there were no threats, the deputies went to defendant's bedroom. Defendant was sleeping on his bed. Deputy Roberts tried to wake him, but the defendant did not respond. Deputy Roberts then nudged him and shook his arm in order

to wake the defendant. Tr. at 57, 64.

Defendant was asked to standup and put his hands behind his back. Once he did that, Deputy Roberts handcuffed him. Tr. at 56. Defendant, who was dressed, was patted down for the officers' safety. He was then placed into Deputy Lunsford's police vehicle. Tr. at 25, 58, 73. No one threatened the defendant, promised him anything, or coerced him. Tr. at 58-9, 80. Nor did Donnelly observe anyone mistreating the defendant. Tr. at 25. No one yelled or raised the voices. Tr. at 61, 80. Defendant did not invoke his right to remain silent, nor did he ask for an attorney. Tr. at 58.

Deputy Roberts believed that defendant understood what was occurring. Tr. at 59-60. It did not appear to Deputy Roberts that the defendant was under the influence of drugs or alcohol. Tr. at 61. Deputy Roberts gave the defendant a witness statement form. Tr. at 60; Gov. Ex. 7.

Deputy Lunsford went into her vehicle. She was sitting in the driver's seat and defendant was sitting in the front passenger's seat. Tr. at 73. Deputy Lunsford had an Advice of Rights form. At about 1:59 p.m., she filled out the form with the defendant and read him his *Miranda* rights. Tr. at 74-7; *see also* Gov. Ex. 8 (Advice of Rights form); Gov. Ex. 9 (recorded interview); Gov. Ex. 9A (transcript), at 1. Defendant put his initials next to each of the rights indicating that he understood them, waived his rights, and agreed to talk with Deputy Lunsford. Tr. at 79; *see also* tr. at 81. Defendant also made a written statement. Tr. at 81; Gov. Ex. 8. Deputy Lunsford also asked defendant for permission to search his phone, and defendant refused. Tr. at 90, 111. After the interview, defendant was taken to the Jefferson County Sheriff's Department's jail where he was booked and processed.

Defendant was not promised anything, threatened, or coerced. Nor did anyone try to scare

the defendant into making a statement. Tr. 81. Defendant understood the questions the Deputy Lunsford asked and responded appropriately. She did not believe that the defendant was under the influence of drugs or alcohol. Tr. at 81. Deputy Lunsford believed that the defendant understood what he was doing. Tr. at 81.

Shortly after 2:00 p.m., Corporal Scott Poe of the Jefferson County Sheriff's Office arrived. Tr. at 108. Corporal Poe took custody of defendant's LG cell phone that had been seized by Deputy Roberts. Tr. at 92. The phone had been turned off when Corporal Poe received it. Tr. at 93. Corporal Poe did not turn the phone on and did not try to examine its contents. Corporal Poe kept the phone in his care until the phone could be forensically examined.

Corporal Poe went to Deputy Lunsford's police vehicle to speak with the defendant. *See* tr. at 93. Corporal Poe asked the defendant for permission to search his residence. *See* Gov. Ex. 10. The defendant refused to grant permission. Tr. at 95. Although defendant was afraid that his refusal would be held against him, Corporal Poe explained that he would not. *See* Gov. Ex. 9; Gov. Ex. 9A, at p. 11-12.

Corporal Poe contacted a Jefferson County prosecuting attorney about applying for a search warrant. *See* Gov. Ex 9; Gov. Ex. 9A, at p. 13-14. After their conversation, Corporal Poe met with the prosecutor. Tr. at 98. Corporal Poe explained the facts to the prosecutor and told the prosecutor that he wanted to obtain a search warrant to search the defendant's residence and LG cell phone. Tr. at 98-100. Corporal Poe also told that prosecutor that the phone was currently in his possession, and not at the residence. Tr. at 100. The prosecutor then signed off on the search warrant application and sent it to the judge for the judge's review. The judge approved the search warrant. *See* tr. at 101; Gov. Ex. 11 (search warrant, affidavit, and application). Based upon his

conversation with the prosecutor and the judge signing the search warrant, Corporal Poe believed that the cell phone could be forensically examined. Tr. at 101; 120. If the prosecutor would have told Corporal Poe that he needed a separate search warrant for the phone, he would have sought one. Tr. at 104.

Corporal Poe went back to the defendant's residence and executed the search warrant. Tr. at 102. After executing the search warrant, he filed the search warrant return. Gov. Ex. 12. The return lists all the items seized from the residence, and the seizure of the cell phone. The listing of the cell phone is set apart from the other items seized from the residence and had a notation that stated, "One LG brand phone provided by reporting party upon initial arrival." Tr. at 103; Gov. Ex. 12.

Eventually the phone was forensically examined and additional child pornographic images of "M" were found. *See* tr. at 116-8. However, defendant has never been questioned by law enforcement officers about what was found during the forensic examination of the phone. Tr. at 106.

This all occurred on Sunday, January 1, 2017. New Year's Day holiday was celebrated on January 2, 2017. The next workday was January 3, 2017. *See* Tr. at 106. On January 3, 2017, Corporal Poe went to the Jefferson County Jail, took custody of the defendant, and took defendant to an interview room at the sheriff's office. Tr. at 106. Defendant was not represented by counsel at that time. *See* tr. at 106. Corporal Poe began interview the defendant about 9:54 a.m. Tr. at 107. Corporal Poe brought the Advice of Rights form that defendant signed to the interview. Tr. at 107; *see* Gov. Ex. 8. Corporal Poe showed the defendant the form, pointed to the defendant's signature on the form, and reminded him that he waived his rights. Tr. at 107-

8. Corporal Poe thanked defendant for his cooperation and honesty. Tr. at 108.

Prior to this time, there was no federal involvement in the case. Tr. at 122. The first time Corporal Poe became aware of federal involvement was when the prosecuting attorney handling the case called him and said that SA Burbridge would be contacting him. Tr. at 122.

SA Burbridge, a 30-year veteran of the FBI, became involved in this case in March 2017. Tr. at 124, 141. SA Burbridge received the investigative materials in April 2017. Based upon his review of the matters, he decided to apply for a federal search warrant to review the contents of defendant's LG cell phone. SA Burbridge was concerned whether the state search warrant (Gov. Ex. 11) covered defendant's cell phone. Tr. at 125. SA Burbridge also sought advice whether he should apply for a federal search warrant, and was informed that it would be better to obtain one. Tr. at 125. SA Burbridge then prepared an affidavit and applied for a search warrant. SA Burbridge did not include in the search warrant that Jefferson County Sheriff's office personnel had already search the cell phone, because he did not want to influence the Court's decision with possibly tainted evidence. Tr. at 147-8.

In the affidavit, SA Burbridge wrote the events giving rise to probable cause. *See* Gov. Ex. 14. The events were written in chronological order. *See* Gov. Ex. 14. In one of the paragraphs, SA Burbridge wrote, "Deputy Roberts seized the cellular telephone and no additional examination was done. The cellular telephone was a LG. . . ." Gov. Ex. 14, p. Sullentrop_00068; Tr. at 145. During the evidentiary hearing, SA Burbridge explained that he was informing the Court what Deputy Robert had done, he was not trying to assert that an examination was never performed. *See* tr. at 146.

SA Burbridge applied for and obtained a search warrant to search defendant's LG cell

phone. *See* Tr. at 126-8; Gov. Ex. 14. SA Burbridge later filed the search warrant return with the Court. Tr. at 128; Gov. Ex. 15.

### III.   LEGAL ANALYSIS

Defendant filed his post-haring brief on June 7, 2018. Defendant seeks to suppress defendant's LG cell phone and its contents claiming:

1.      Police conducted a search of the phone without consent and without a search warrant; and

2.      Police conducted a second search of the phone without consent and without a warrant at the Jefferson County Sheriff's department narcotics division.

See "Defendant's Post Hearing Memorandum for Motion to Suppress Evidence and Statements" (Doc. #45), at 1 (hereinafter, ("Memorandum").

In responding to defendant's Memorandum, the Government relies upon, and incorporates by reference, its previous response in Doc. #30.

A.      **Officers Properly Searched Defendant's Phone**

The Government agrees with the defendant that the "Fourth Amendment protects the 'right of people to be secure in their persons, houses, papers, and effects, against unreasonable search and seizures." *United States v. Houck*, 888 F.3d 957, 959 (8th Cir. 2018) citing U.S. Const. amend. IV. The Fourth Amendment protects people from unreasonable search and seizures conducted by police. *See Riley v. California*, 134 S.Ct. 2473, 2482 (2014) ("Our cases have determined that '[w]here a search is undertaken by law enforcement officials to discover evidence of wrongdoing, . . . reasonableness generally requires the obtaining of a judicial warrant.'"). If a search is conducted by a private party without police involvement, however, the

Fourth Amendment is not implicated. *See United States v. Gonzalez*, 781 F.3d 422, 427 (8th Cir. 2015).

Here, Paul Donnelly searched defendant's LG cell phone. The search was not initiated by the police, nor was the search done at the request of police. It was a private search. "Private searches do not implicate the Fourth Amendment. The Fourth Amendment protects only against government action. A search by a private party with no government knowledge or participation does not implicate this constitutional right to be free from unreasonable searches and seizure." *United States v. Gonzalez*, 781 F.3d 422, 429 (8th Cir. 2015) (citations and internal quotations marks omitted); *see also United States v. Goodale*, 738 F.3d 917, 921 (8th Cir. 2013).

1.      *United States v. Harling*

For example, in *United States v. Harling*, 705 Fed.Appx. 911 (11th Cir. 2017), Nicole Dunwody rented a condo from Harling. When she was moving in, she found three USB drives that had been kept on the top of a doorframe inside a closet. She showed the drives to her mother, Ada Dunwody, who plugged one of the three drives into her computer. When Ada plugged the drive into her computer "large thumbnail images loaded onto the screen." *Id*. at 913. Ada and Nicole observed small children engaging in sexually explicit conduct with adults. They viewed about thirty thumbnail images and called the police. After they called the police, they looked at the contents of another USB drive. On that drive they saw more than 100 images and videos of young children engaged in sexually explicit poses. When they plugged in the last drive, they saw unfamiliar file types and did not search any further. They placed all three drives into a plastic bag to give to the police.

A police officer met with them at the condo. They gave the officer the USB drives, told

them what they found, and showed them where they found them. The officer went to the closet and found two more USB drives in the same location as the others. He seized all five USB drives and returned to the station. There, he opened one image file and one video file on each of the USB drives to confirm that all the drives contained child pornography. He also saw a series of images of a child being sexually abused by an adult male.

Later, a limited forensic examination was conducted of the USB drives to confirm that they contained child pornography and to determine who the owner was. *Id.* at 914. The examiner identified the owner and confirmed that was child pornography images were on the drives. He was also able to confirm that Harling was the adult male in the series of images.

The examiner then contacted the Department of Homeland Security for assistance. DHS agents were able to match Harling's Facebook page with the images found on the USB drives.

Officers then contacted Harling, advised him of his rights, and interviewed him. Later that day, officers applied for and received a search warrant to conduct complete forensic examinations of the five USB drives. The "affidavit included the detailed descriptions conveyed to him by both Nicole and Ada regarding exactly what they had seen on the USB drives." *Id.* at 914-15. During the forensic exams that followed, hundreds of images were found of Harling sexually abusing a child. Based upon those results, another search warrant was obtained to search Harling's residence. During the execution of the search warrants, officers seized additional evidence of the crime.

Harling was charged in federal court with possessing child pornography. He moved to suppress the contents of the five USB drives and any evidence seized from his home. The district court denied his motion and a jury subsequently found Harling guilty. On appeal, Harling argued

that the officers violated the Fourth Amendment by seizing and searching the property without a warrant.

The court of appeals said that the Fourth Amendment only applied to government action and not to private searches. Nicole and Ada were "private citizens who acted of their own accord when they viewed the contents of the first two USB drives. Therefore, law enforcement's subsequent search of the first and second USB drives, after listening to Nicole and Ada describe in detail what they had observed, was not violative of the Fourth Amendment since it did not meaningfully exceed the scope of Ada's search. The officers replicated a search already conducted by private citizens who acted independently, observed what they thought to be child pornography, and shared their concerns with the officers, when then confirmed that the drives contained what [they] reported." *Id*. (citation omitted).

The court found that the officers violated the Fourth Amendment when they searched the three other USB drives, but found that the contents were still admissible under the independent source doctrine. The following is the two-part test the court used to determine whether the evidence was admissible:

> The first thing we do is excise from the search warrant affidavit any information gained during the arguably illegal initial entry and determine whether the remaining information is enough to support a probable cause finding. If the remaining or nonexcised information is enough to support a probable cause finding, the second thing we do is determine whether the officer's decision to seek the warrant was "prompted by" what he had seen during the arguably illegal entry. To determine whether an officer's decision to seek a warrant is prompted by what he saw during the initial entry, courts ask whether the officer would have sought the warrant even if he had not entered. If the officer would have done so, his decision to seek the search warrant is supported by an "independent source," and the evidence seized under the warrant is admissible regardless of whether the initial entry violated the Fourth Amendment.

*Id.* quoting *United States v. Noriega*, 676 F.3d 1252, 1260 (11th Cir. 2012); *see also United States v. Swope*, 542 F.3d 609, 613-14 (8th Cir. 2008) (for the independent source doctrine to apply, the court must determine whether the "police would have applied for the warrant had they not acquired the tainted information; and . . . do the application affidavits support probable cause after the tainted information has been redacted from them.").

Applying the test, the court determined that probable cause still existed based upon the private search of the two USB drives. Second, the court determined that based upon the private search of the two USB drives, a law enforcement officer would have sought a search warrant to search the drives even if the officer was not aware child pornography had been found on all the drives. The court concluded that the motion to suppress was properly denied. *Id.* at 918.

a. *Analysis under Private Search Doctrine*

Just like Nicole and Ada conducted a private search of the two USB drives, Donnelly conducted a private search of defendant's cell phone. Just like Nicole and Ada located thumbnail images involving child pornography, Donnelly located thumbnail images of child pornography on defendant's cell phone. And just like the police in *Harling* were permitted to conduct a warrantless examination of the two USB drives as long as their examination "did not meaningfully exceed the scope of the Ada's search,"[1] police in this case were permitted conduct a warrantless examination of defendant's LG cell phone, as long as they did not meaningfully exceed the scope of Donnelly's search.

Furthermore, in *Harling*, the court did not suppress the additional images observed by the police, such as the series of produced images, because the search did not meaningfully exceed

---

1 *Id.* at 916.

the scope of the search conducted by Nicole and Ada. Here, under the holding in *Harling*, the police could examine the child pornography images contained in defendant's cell phone, without a warrant. However, unlike *Harling*, the police here did seek a search warrant, which they believed covered the cell phone, before they examined the contents of defendant's phone.

b.   *Analysis under the Independent Source Doctrine*

If the Court determines that officer's search of defendant's cell phone meaningfully exceed the scope of the private search, the evidence is still admissible under the independent source doctrine. Not only did Corporal Poe consider obtaining search warrant, but he did obtain a search warrant for defendant's residence and electronic equipment. The information used in the affidavit was not based upon the officers' subsequent examination of the search, because police conducted no further search; Officer Roberts observed only what Donnelly showed him.

Later, a federal search warrant was obtained to search the phone. Although the federal search warrant was applied for after the police searched the phone, the federal search warrant affidavit did not rely on this information. *See United States v. Brooks*, 715 F.3d 1069, 1075 (8th Cir. 2013) (a subsequent search warrant satisfied the independent source requirements because law enforcement would have sought a warrant even if they were not aware of the tainted information and the affidavits supported probable cause after excluding the tainted information).

SA Burbridge applied for the search warrant because he did not know whether the state search warrant covered the phone. Tr. at 125. In applying for the search warrant, SA Burbridge relied on the private search by Donnelly, and not on the later search by law enforcement. Furthermore, the evidence obtained by police during their subsequent searches of the phone was not included in the warrant, thus the Magistrate Judge's decision was not affected by the police

15

search. Thus, the federal search warrant satisfies the independent source doctrine. *See Brooks*, 715 F.3d at 1075.

Defendant sights *Swope* arguing that "the independent source doctrine applies when the United States would have applied for a warrant without having first acquired tainted information AND the affidavits in support of the warrant application establish probable cause without any reliance on the tainted information." "Defendant's Memorandum," at p. 12. However, the *Swope* court did not preclude the application of the independent source doctrine if the law enforcement had first acquired the tainted information. Instead, the held that "[a] warrant obtained after an illegal search is not an independent source if either of the following are true: 'if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry,' and 'if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant.'" *Swope*, 542 F.3d at 613, citing *Murray v. United States*, 487 U.S. 533, 542 (1988).

In the district court case of *United States v. Sukhtipyaroge*, 17-cr-0209 (WMW/SWER). 2018 WL 1726266 (D. Minn, Apr. 10, 2018), A.M, the victim, said that Sukhtipyaroge sexually abused him and that his cell phone contained photographs of the sexual contact. A.M. also said that there were images of the sexual contact on an SD card that A.M. had removed from Sukhtipyaroge's computer. A law enforcement copied the contents of A.M.'s cell phone and seized the SD card. He later obtained a search warrant for the SD card and search warrants to search properties where the incidents occurred. The search warrants for the properties included searching for items that contained data, including cell phones. The search warrants also authorized forensic examination of the electronics.

16

Officers arrested Sukhtipyaroge and seized a cell phone from him. That cell phone was inadvertently submitted with the other electronics for forensic analyses, and was examined, even though the examination for the cell phone was not authorized by the search warrant. Later, the officers realized their mistake. Subsquently, a special agent with Homeland Security applied for and received a search warrant to search Sukhtipyaroge's cell phone. Sukhtipyaroge moved to suppress, among other things, the cell phone.

The district court found that the independent source doctrine applied. First, the search warrant affidavit did not contain any tainted information. Second, the record showed that officers would have applied for the warrant for the cell phone because:

(a)     A.M. alleged that Sukhtipyaroge owned a cell phone and used it to take naked pictures of A.M.;

(b)     a detective applied for search warrants to search Sukhtipyaroge's properties, and those search warrants were based upon A.M.'s allegations and not evidence later obtained from the warrantless search; and

(c) each warrant authorized the seizure and examination of cellular telephones. The court determined, "On these facts, the record establishes that the government not only would have applied for a search warrant for Sukhtipyaroge's cell phone before obtaining any tainted evidence, but the government actually did so. For these reasons, the independent-source doctrine excuess the warrantless search of Sukhtipyaroge's HTC cell phone by the state authorities." *Id*. at *3.

Here, SA Burbridge's decision was prompted by what he had learned from the private search, because his affidavit did not rely on, nor even mention, the law enforcement search of

17

defendant's cell phone. Second, the information obtained from law enforcement's search of defendant's phone was not presented to the Court when SA Burbridge applied for the search warrant. Thus, the federal search warrant was an independent source, and the evidence should not be suppress.

2.   *Riley v. California*

Defendant argues that the evidence should be suppressed under *Riley v. California*, 134 S.Ct. 2473 (2014). The issue in the *Riley* case was whether a cell phone could be searched incident to a lawful arrest without a search warrant. The Supreme Court determined that the search incident to arrest doctrine did not apply to cell phones. The Court ruled "that officers must generally secure a warrant before conducting" a search of data on cell phones. *Id.* at 2485. The Court, however, found that "other case-specific exceptions may still justify a warrantless search of a particular phone." *Id*. at 2494.

In this case, the Government is not claiming that defendant's cell phone could be searched under the incident to arrest doctrine. The Government is claiming that the search was permissible under (1) the private search doctrine, (2) under good faith reliance on state search warrant, (3) under the inevitable discovery doctrine, [2] and (4) under the independent source doctrine based upon the federal search warrant.

B.   **Defendant was Mirandized and Knowingly and Intelligently waived his Rights**

Defendant moved to suppress statements (Doc. #33) that defendant made to law enforcement officers claiming that the statements were not voluntary, the statement were made

---

[2] Although not discussed in this Memorandum, the government relies on its previously filed memorandum. (Doc. #30), pp. 11-13.

without the defendant first being advised of his constitutional rights, and the statements were the
direct result of an unlawful arrest.

### 1.    *Miranda Warnings and Waiver of Rights*

Generally, *Miranda* warnings must be given when a person is interrogated after being
taken into custody. *United States v. Huether*, 673 F.3d 789, 794 (8th Cir. 2012). "To establish a
valid Miranda waiver, the Government must show that the waiver was knowing, intelligent, and
voluntary." *United States v. Woods*, 829 F.3d 675, 680 (8th Cir. 2016) (citation omitted). Here,
the government made such a showing. Deputy Lunsford advised defendant of his *Miranda* rights.
At about 1:59 p.m., she filled out the form with the defendant and read him his *Miranda* rights.
Tr. at 74-7; *see also* Gov. Ex. 8 (Advice of Rights form); Gov. Ex. 9 (recorded interview); Gov.
Ex. 9A (transcript), at 1. Defendant put his initials next to each of the rights indicating that he
understood his rights, waived his rights, and agreed to talk with Deputy Lunsford. Tr. at 79; *see
also* tr. at 81. Defendant also made a written statement. Tr. at 81; Gov. Ex. 8.

Likewise, when Corporal Poe interviewed the defendant on January 3, 2017, he showed
the defendant the *Miranda* form that the defendant previously signed and initialed. Under the
circumstances, that was sufficient. *See United States v. Nguyen*, 608 F.3d 368, 374-75 (8th Cir.
2010) (one day lapse between *Miranda* warning and the interrogation did not render defendant's
waiver infective); *United States v. Caja-Maldonado*, 13 Fed.Appx. 469, 475, n.7 (8th Cir. 2001)
("we cannot conclude that the eleven-day interval between the Defendant's *Miranda* warnings
and the Defendant's May 5, 2000 interview was unreasonable.").

Regarding the voluntariness of the statements, the record clearly shows that defendant
was not coerced, threatened, promised, or frightened into making a statement. Nor was the

defendant under the influence of drugs or alcohol when the statements were given. The

defendant understood the questions posed, and answered appropriately. Thus, the record clearly

demonstrates that defendant's statements were voluntarily.

2.       *Lawfulness of Arrest*

Lastly, defendant's arrest was lawful. "A warrantless arrest by law enforcement is

reasonable where there is probable cause to believe that someone has committed or is

committing a crime." *United States v. Winarske*, 715 F.3d 1063, 1066 (8th Cir. 2013) (citation

omitted). "In making this determination, '[l]aw enforcement officers have substantial latitude in

interpreting and drawing inferences from factual circumstances.'" *United States v. Webster*, 625

F.3d 439, 442 (8th Cir. 2010) quoting *United States v. Henderson*, 613 F.3d 1177, 1181 (8th Cir.

2010). To determine whether there is probable cause, a court examines the facts to determine

whether an objectively reasonable police officer would conclude that probable cause to arrests

exists. *See United States v. Winarske*, 1063, 1066 (8th Cir. 2013). "[T]he mere 'probability of

substantial chance of criminal activity, rather than an actual showing of criminal activity,' is all

that is required." *Id.* citing *United States v. Mendoza*, 421 F.3d 663, 667 (8th Cir. 2005). An

officer's subjective intent in making the arrest is not relevant. *See United States v. Demilia*, 771

F.3d 1051, 1055 (8th Cir. 2014). Furthermore, an arresting officer can rely on information

provided to the officer from other officers. *See United States v. Stratton*, 453 F.2d 36, 37 – 38

(8th Cir. 1972).

There was probable cause to arrest based upon the statements made by Donnelly and

image Donnelly showed Deputy Roberts. Defendant's statements to the officers bolstered the

probable cause to arrest him. Thus, police lawfully arrested the defendant.

20

## IV.   CONCLUSION

For all of the foregoing reasons, the defendant's motion to suppress evidence should be

denied.

Respectfully submitted,

JEFFREY B. JENSEN
United States Attorney


 *s/ Robert F. Livergood*
ROBERT F. LIVERGOOD, 35432MO
Assistant United States Attorney
111 S. 10th Street, Rm. 20.333
St. Louis, Missouri 63102
(314) 539-2200


## CERTIFICATE OF SERVICE


I hereby certify that on June 25, 2018, the foregoing was filed electronically with the

Clerk of the Court to be served by operation of the Court's electronic filing system upon the

following:

Mr. Joseph Hogan
Attorney for the Defendant.

*s/ Robert F. Livergood*
ROBERT F. LIVERGOOD, 35432MO
Assistant United States Attorney

21