UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  4:17 CR 435 CDP (JMB) |
| | ) | |
| DENNIS M. SUELLENTROP, JR., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM, REPORT, & RECOMMENDATIONS**

Currently before the Court are two suppression motions filed by Defendant Dennis M. Suellentrop, namely a Motion to Suppress Physical Evidence (ECF No. 25),[1] and a Motion to Suppress Statements (ECF No. 33).  The government opposes both motions.  The Court held an evidentiary hearing on February 28, 2018.  Thereafter, the parties submitted post-hearing memoranda.  (ECF Nos. 45, 49)  Pretrial matters have been referred to the undersigned United States Magistrate Judge, under 28 U.S.C. § 636(b).  The undersigned recommends that Suellentrop's motions be denied.

**INTRODUCTION & BACKGROUND**

Suellentrop is charged in a multi-count Indictment with production of child pornography (Counts 1-7) and possession of child pornography (Count 8).  The charges resulted from photographs and videos located on Suellentrop's cell phone.  As will be discussed in greater detail below, on January 1, 2017, an individual named Paul Donnelly provided the phone to the

---

[1] Suellentrop submitted a lengthy exhibit with his Motion to Suppress Physical Evidence. (ECF No. 25-1)  For the most part, Defendant's exhibit consists of records related to Jefferson County Case No. 17JE-CR00001, although Suellentrop also included a copy of a federal search warrant, issued in E.D. Mo. Case No. 4:17 MJ 1191 JMB.  The undersigned has considered these records and will refer to them, as appropriate, in addressing Suellentrop's pending motions.

Jefferson County Sheriff's Department after observing images of Suellentrop's daughter on the phone.  Suellentrop was arrested and interviewed by the Sherriff's Department.  The case was eventually referred for federal prosecution.

Suellentrop contends that any evidence seized from his cell phone must be suppressed. Suellentrop argues that any warrantless search was done in violation of the Fourth Amendment. Suellentrop also contends that a State-issued search warrant did not encompass his cell phone. Finally, Suellentrop argues that a subsequent federal search warrant was flawed because the affidavit submitted for that warrant intentionally or recklessly omitted material information and included material false information.

The government argues that a warrantless search of Suellentrop's cell phone was lawful under the private search doctrine.  The government also contends that a later examination of the cell phone was conducted in good faith reliance on the State-issued search warrant. Additionally, the government argues that, even if the prior State warrant did not encompass the phone, any evidence obtained pursuant to the federal search warrant is admissible under the independent source and inevitable discovery doctrines.

On February 28, 2018, the undersigned held an evidentiary hearing.  Shortly before the hearing, Suellentrop filed a broad motion to suppress statements.  The Court directed Suellentrop to narrow his motion in his post-hearing memorandum, and directed the government to respond in its post-hearing memorandum.

At the evidentiary hearing, Suellentrop was present and represented by Joseph Hogan. The government was represented by Assistant United States Attorney Robert Livergood.  The government presented the testimony of Paul Donnelly, Jefferson County Sheriff's Deputies Dennis Roberts and Hollie Lunsford, Detective Scott Poe of the Jefferson County Sheriff's

Department, and FBI Special Agent John Mark Burbridge.  Defense counsel extensively cross-examined each witness.  Suellentrop testified briefly on his own behalf.

At the hearing, the government admitted several exhibits which are summarized in the following table:

| TABLE | |
|---|---|
| **Exhibit No.** | **Description** |
| 1 | LG Cell Phone (Suellentrop's Cell Phone) |
| 2 | Picture – Home Screen on Cell Phone |
| 3 | Picture – Cell Phone Application Screen |
| 4 | Video – Demonstrating Access of Cell Phone Images |
| 5 | Alleged Child Pornography Image of Victim |
| 6 | Alleged Child Pornography Video of Victim |
| 7 | Voluntary Statement – Paul Donnelly, 1/1/2017 |
| 8 | Advice of Rights Form – Suellentrop, 1/1/2017 |
| 9 | Audio Recording – Suellentrop Interview in Deputy's Vehicle, 1/1/2017 |
| 9A | Transcript of Suellentrop Interview, 1/1/2017 |
| 10 | Permission to Search Form, Unexecuted, 1/1/2017 |
| 11 | State Search Warrant, Application, & Affidavit, 1/1/2017 |
| 12 | Return of State Search Warrant |
| 13 | Audio & Video Recording – Suellentrop Interview, 1/3/2017 |
| 13A | Transcript of Suellentrop Interview, 1/3/2017 |
| 14 | Federal Search Warrant, Application, & Affidavit, 4:17 MJ 1191 JMB, 6/20/2017 |
| 15 | Return of Federal Search Warrant |

Based on the testimony and evidence adduced at the evidentiary hearing, having had the opportunity to observe the demeanor and evaluate the credibility of the witnesses, and having fully considered the parties' arguments and written submissions, the undersigned makes the

following findings of fact, conclusions of law, and recommendations.

## FINDINGS OF FACT

At all times relevant, Suellentrop lived at 2566 East Rock Creek Rd., Jefferson County, Missouri.  The property was owned by Suellentrop's family.  Suellentrop had an infant child with a girlfriend named Sarah Marcher.  At the hearing, the child was sometimes referred to by name but is referred to herein as Baby M.  The record indicates that Baby M. and Ms. Marcher sometimes stayed at the 2566 East Rock Creek property, but Baby M. and Ms. Marcher did not stay there the night of December 31, 2016, into the morning of January 1, 2017.

Beginning sometime before December 2016 and continuing until at least January 1, 2017, Paul Donnelly lived on the property at 2566 East Rock Creek Rd.  Donnelly was a drug user[2] and acquainted with Suellentrop, Marcher, and the infant.  Donnelly testified that he had known Suellentrop for about one year as of January 1, 2017.  Donnelly kept a camper in the driveway, about thirty feet in front of the residence at 2566 East Rock Creek Rd.  Donnelly testified that he cleaned and worked around the house and that a drug dealer named Matt also stayed there.

There was conflicting testimony regarding the extent of Donnelly's permission to reside on the property, enter the residence at the property, stay inside the residence, and use Suellentrop's cell phone.  Donnelly testified that he kept his camper in the driveway and lived in the camper, but he had permission to stay inside the residence due to the cold weather.  Donnelly testified that he kept clothes inside the residence and in the camper.  Donnelly testified that he was permitted to stay inside during the time frame spanning New Year's Eve and Day 2016-

---

[2] Donnelly testified that, at the time of the evidentiary hearing, he was charged in state court with possession of methamphetamine.  Donnelly also testified that he had a prior felony marijuana conviction for which he received a suspended imposition of sentence that has since been expunged from his record.  Donnelly represented that he received no consideration in return for his testimony in this matter.

2017.  Donnelly further testified that Suellentrop gave him permission to use Suellentrop's cell phone to make calls and access Facebook after Donnelly gave his cell phone to a former girlfriend.  Donnelly testified that Suellentrop's cell phone was passcode protected and that Suellentrop had given him the code.  Donnelly also testified that, most of the time, Suellentrop was present when Donnelly used his cell phone.

In contrast, Suellentrop testified that, in November 2016, he directed that Donnelly was no longer welcome on the property and was not given permission to be in his residence or to use his cell phone.  Suellentrop testified that Donnelly must have learned his passcode by watching him enter it into the cell phone.

The undersigned credits the testimony of Donnelly to the extent it conflicts with Suellentrop's testimony.  Donnelly was candid, admitting his past criminal conduct and drug use.  Donnelly's testimony was consistent with the testimony of police who testified to events on January 1, 2017.  In contrast, Suellentrop testified that Donnelly was no longer welcome on his property as of November 2016, yet he never took steps to remove Donnelly, never called the police, and never required Donnelly to remove his camper.  Accordingly, the undersigned finds that, on January 1, 2017, Donnelly had permission to enter and stay inside the residence at 2566 East Rock Creek Rd., and permission to use Suellentrop's cell phone to make calls and check his Facebook account.

On New Year's Eve 2016, Donnelly, Marcher, and others were "partying" at a local casino.  Donnelly was using drugs that evening.  Suellentrop was not with Donnelly and Marcher.  Donnelly returned to the East Rock Creek residence around 7 a.m. or 8 a.m. on January 1, 2017.  Marcher and Baby M. did not stay at the residence on January 1, 2017.

After returning to the East Rock Creek residence during the morning of January 1, 2017,

Donnelly knocked on Suellentrop's bedroom door, entered the bedroom, and retrieved Suellentrop's cell phone from the charger.  Donnelly observed Suellentrop "passed out" in the bedroom.  Donnelly unlocked the phone and used it to make a call and check his Facebook account.  According to Donnelly, he was being "nosey" and decided to look at Suellentrop's photographs on the cell phone.  Donnelly accessed the photo application screen and observed a series of thumbnail images.[3]  Donnelly did not scroll through all of the thumbnails but he testified that he could see "pictures of girls and other things, but the main images were kind of blurry at that size until [he] zoomed in on them."  (Tr. at 17)[4]

Donnelly zoomed in on one image and realized it was a pornographic image of Suellentrop's infant daughter, Baby M.  Donnelly was shown Government's Exhibit 5, which depicted an image of an infant with a penis and what appeared to be ejaculate on the infant's face.  Donnelly testified that Exhibit 5 was one of the images he viewed on Suellentrop's cell phone and that the infant in the image was Baby M., who was then about six months old.

Donnelly testified that he saw other images and a video on the cell phone.  Donnelly was shown a portion of Government's Exhibit 6—a video showing an infant's buttocks area and an adult's hands on and around the buttocks area.  Donnelley testified that he had also viewed the video on Suellentrop's cell phone on January 1, 2017, and that Suellentrop could be seen at a later point in the video.

Donnelly testified that, while looking through the pictures on Suellentrop's cell phone, he also saw images that did not include Baby M. but included "penises in their mouth, and …

---

[3] At the evidentiary hearing, the Court received Government's Exhibit 4, which was a video recreating the steps Donnelly used to access the photos on Suellentrop's cell phone, including the thumbnail images and scrolling through the thumbnails.

[4] "Tr." refers to the transcript of the evidentiary hearing held on February 28, 2018. (ECF No. 38)

penises on the picture all around" that "seemed to be photoshopped."  (Tr. at 18)

After seeing the images and video of child pornography on Suellentrop's cell phone, Donnelly did not call the police.  Rather, he called the house where he believed Sarah Marcher was staying, which was in Imperial, Missouri.  Donnelly spoke with Matt and told him what he found on Suellentrop's phone.  According to Donnelly, he intended to take care of matters "in house."  Nonetheless, the police were notified and there is no indication that Donnelly or anyone else harmed Suellentrop.[5]

Jefferson County Sheriff's Deputy Dennis Roberts was first to arrive at the East Rock Creek Road residence.  As of the date of the evidentiary hearing, Dep. Roberts had been a deputy for about nine years.  At about 1:30 p.m., on January 1, 2017, Dep. Roberts was dispatched to Suellentrop's residence for a child well-being check.  He arrived shortly thereafter.  Dep. Roberts was met by Donnelly who was walking toward the patrol car.  Donnelly told Dep. Roberts that he borrowed Suellentrop's cell phone and that he viewed inappropriate images on that phone. Donnelly showed Dep. Roberts one photo—the same photo that was depicted in Gov't Exh. 5. Dep. Roberts took possession of the cell phone, turned it off, and placed it in his pocket.  Dep. Roberts did not look at contents of the cell phone any further.

Donnelly told Dep. Roberts about seeing a picture of Baby M. with a penis in her mouth, as well as a video depicting Suellentrop "playing with the butt and the vagina area and French kissing [Baby M.] with his tongue."  (Tr. 55-56)

After Dep. Roberts began speaking with Donnelly, Jefferson County Sheriff's Deputies

---

[5] The record regarding how the police were ultimately informed is not entirely clear.  But overall, the record indicates Donnelly spoke with Matt, who was with Sarah Marcher (Baby M.'s mother), and thereafter the police were notified and dispatched to Suellentrop's home.  Matt arrived at Suellentrop's home before law enforcement arrived, but Suellentrop remained in bed. Donnelly testified that Matt told Sarah Marcher about the images on the cell phone.

Hollie Lunsford and Loness arrived at the scene.[6]  Dep. Roberts discussed what he had learned from Donnelly with the other deputies and they decided to arrest Suellentrop.[7]  Donnelly voluntarily opened the door and let the deputies inside the residence so they could arrest Suellentrop.  Dep. Roberts testified that he believed Donnelly had authority to let the deputies into the house.  The deputies were in uniform and armed, but all weapons remained holstered.  After a brief security sweep of the residence, the Deputies went into Suellentrop's bedroom and found him sleeping.  Suellentrop did not respond to a verbal command to wake up, so Dep. Roberts nudged him and he woke up.  Dep. Roberts directed Suellentrop to stand up and place his hands behind his back.  Suellentrop was allowed to dress and was compliant.  Suellentrop was handcuffed, subjected to a pat-down search, and placed in Dep. Lunsford's patrol car.

After arresting Suellentrop, Dep. Roberts provided Donnelly with a witness statement form, a copy of which was received into evidence as Government's Exhibit No. 7.  Donnelly's witness statement, as reflected in Gov't Exh. 7, is generally consistent with his testimony at the evidentiary hearing, although some details differed.[8]  Dep. Roberts also contacted Jefferson County Sheriff's Detective Scott Poe.

Dep. Lunsford testified that, when she arrived, she observed Dep. Roberts speaking with Donnelly.  Dep. Lunsford explained that Donnelly gave her and Deputies Roberts and Loness

---

[6] Deputy Lunsford testified at the evidentiary hearing, but Dep. Loness did not.  At the time of the hearing, Dep. Lunsford was a Detective and had been with the Sheriff's Office for about eight years.

[7] Dep. Roberts testified that the information provided to him from Donnelly described a crime.  (Tr. 64)

[8] For example, Donnelly testified that he arrived home around 7 a.m., but Gov't Exh. 7 indicates that Donnelly arrived home around 8 a.m.  Also, Donnelly's statement indicates that he contacted Baby M's mother, but his testimony was that he called another person.  The differences are not significant in the context of the issues before the Court.

permission to go into the residence to locate and arrest Suellentrop.  As noted above, after

arresting Suellentrop, the officers placed him in the front passenger seat of Dep. Lunsford's car.

Dep. Lunsford entered the vehicle and presented Suellentrop with a two-page, detailed <u>Miranda</u>

warnings form.  That form was admitted into evidence as Government's Exhibit 8.  Using the

form, Dep. Lunsford advised Suellentrop of his rights.   Dep. Lunsford completed the pedigree

information on the form based on information from Suellentrop.  Suellentrop signed the form

indicating that he understood his rights, was willing to make a statement, did not want a lawyer

at that time, understood what he was doing, and that no promises, threats, or pressure/coercion

had been used against him.  The form is dated January 1, 2017, with a time of 1:59 pm (1359

military time) at the top and 2:07 p.m. next to Suellentrop's signature.  Page two of the form

includes a written statement from Suellentrop which reads:

> I made explicit photos in retaliation for my girlfriend cheating on me and turning
> against me.  There were suggestive photos but no penetration or forced action
> with our daughter.

(Gov't Exh. 8 at p. 2)  Both Suellentrop and Dep. Lunsford signed at the bottom of page two,

below the written statement.

Dep. Lunsford testified that Suellentrop was not threatened, abused, coerced, or promised

anything to induce him to talk.  Dep. Lunsford advised Suellentrop that he could stop talking if

he so desired.  Dep. Lunsford testified that Suellentrop appeared to understand her questions and

did not appear to be under the influence of drugs or alcohol.  At no time did Suellentrop ask for

an attorney or indicate a desire to remain silent.  Dep. Lunsford further testified that officers

asked Suellentrop for consent to search his home and phone and that Suellentrop declined to give

consent.

The interaction between Suellentrop and Dep. Lunsford was recorded.  A copy of the

recorded interview and a transcript of the recording were admitted into evidence as Government's Exhibits 9 and 9A, respectively.  The recording is substantially consistent with Dep. Lunsford's testimony.

As noted above, Dep. Roberts contacted Detective Scott Poe.  When Det. Poe arrived, Suellentrop was already in Dep. Lunsford's vehicle.  Det. Poe was aware that Dep. Roberts had received Suellentrop's cell phone from Donnelly.  Det. Poe eventually took possession of the cell phone.  Det. Poe testified that he secured the phone and did not examine it.  Det. Poe also interviewed Suellentrop in Dep. Lunsford's vehicle.  That interaction was also recorded.  (Gov't Exh. 9)  At no time did Det. Poe threaten or coerce Suellentrop, and Suellentrop never requested a lawyer or invoked his right to remain silent.

Det. Poe also testified that he prepared a consent-to-search form, but Suellentrop declined to sign the form.  Although Suellentrop stated that he feared that his refusal to consent would be held against him, Det. Poe told him that it would not.

Lacking consent from Suellentrop, Det. Poe contacted an on-call prosecutor to request a search warrant.[9]  Det. Poe met with a prosecuting attorney at the Sheriff's Office and completed an affidavit of probable cause.  Thereafter, an application for a search warrant was presented to Judge Miller.  The warrant presentation process was conducted electronically.[10]  At the evidentiary hearing, Det. Poe testified that he advised the prosecuting attorney that Suellentrop's cell phone had already been seized.  Det. Poe further explained that it was his intention to obtain a search warrant that would permit law enforcement to search both the cell phone and

---

[9] A portion of Det. Poe's conversation with the on-call prosecutor was also recorded. (Gov't Exh. 9)

[10] A copy of the warrant, application, and affidavit were received into evidence as Government's Exhibit 11, and the return was submitted as Government's Exhibit 12.

Suellentrop's residence.  Based on his conversation with the prosecuting attorney, Det. Poe

believed that the warrant authorized a search of Suellentrop's cell phone.

A significant issue is whether the warrant Det. Poe obtained on January 1, 2017,

authorized law enforcement to search Suellentrop's cell phone.  At the time the warrant was

issued, the police had already seized the cell phone.  Although the warrant does not specifically

mention searching Suellentrop's cell phone, Det. Poe testified that he believed the warrant

authorized an examination of that device.  It is not disputed that the Jefferson County Sheriff's

Department arranged for more than one forensic examination of Suellentrop's cell phone and

that the Sheriff's Department did not obtain a separate warrant for that device.  It is also not

disputed that Suellentrop never consented to a search of his cell phone.

The affidavit Det. Poe submitted to Judge Miller on January 1, 2017, provided a detailed

account of the investigation up to that point, including a detailed summary of how Donnelly

showed images from Suellentrop's cell phone to Dep. Roberts and the nature of those images.

The affidavit stated that Dep. Roberts took custody of the phone and that "no additional

examination was done."  (See Gov't Exh. 11)  The affidavit also explained how Donnelly came

into possession of Suellentrop's cell phone.  The affidavit summarized Suellentrop's statements

to Dep. Lunsford and Det. Poe, and that Det. Poe requested consent to search the residence "for

any other electronic devices or evidence related to the crime," and that Suellentrop declined to

give consent due to the possibility that drug-related materials belonging to other persons might

be found in the residence.  (Id.)  Det. Poe represented that he believed there was probable cause

to search the premises for evidence including, "DVDs, CDs, video cassettes, mass storage

devices (i.e., hard drives, computers, jump drives, etc.) and photographs of victims."  (Id.)

The warrant expressly authorized law enforcement to search the premises at 2566 East

Rock Creek Road, Arnold, MO (Suellentrop's residence) and, among other things, commanded law enforcement personnel "to search the computers, cameras, storage devices, and electronic devices seized by you, including any files that are password protected or encrypted, for … files and graphic images and/or videos depicting child pornography …." (Id.)

The affidavit and warrant were both signed and dated on January 1, 2017, at 7:19 p.m. Detective Poe prepared a warrant return and inventory (hereinafter "return"). See Gov't Exh. 12. According to the return, the warrant was executed on January 1, 2017. The return includes an inventory of items seized which appears to be separated into two categories: drug paraphernalia and Suellentrop's cell phone, which is listed as "One LG Brand Phone provided by Reporting Party upon initial arrival." (Gov't Exh. 12)

After his arrest on Sunday, January 1, 2017, Suellentrop was held at the Jefferson County Jail. Monday, January 2, 2017, was an official holiday. On January 3, 2017, Det. Poe interviewed Suellentrop again. Prior to the interview, Det. Poe transported Suellentrop from the jail to the Jefferson County Sheriff's Office. The interview was recorded with both audio and video.[11] Det. Poe did not re-advise Suellentrop of his Miranda rights, but stated that he had Suellentrop's statement and prior advice of rights form and displayed that form to Suellentrop. At the outset of the interview, Suellentrop asked for assurances that Det. Poe would not beat him, and Det. Poe assured him that he would not. Det. Poe provided Suellentrop with a cup of coffee. From the video recording of the interview, it appears that Suellentrop understood his circumstances and was not confused or intoxicated. Det. Poe removed the handcuffs and it appears that Suellentrop was reasonably comfortable. Suellentrop was not tricked, threatened, harmed, or in any way abused or mistreated. Suellentrop did not ask for an attorney, express any

---

[11] A copy of the recording of interview was submitted as Government's Exhibit 13, and a transcript of the interview as submitted as Government's Exhibit 13A.

desire to exercise his right to remain silent, or express any complaints regarding his treatment or the interview process.

At the evidentiary hearing, Det. Poe testified that, after he received a report from the cell phone forensic examination, he prepared a supplemental report which resulted in additional charges against Suellentrop.  Det. Poe explained that, at some point after he prepared his supplemental report, he spoke with FBI Special Agent Mark Burbridge about the child pornography found on Suellentrop's cell phone.

S/A Burbridge also testified at the evidentiary hearing.  At the time of the hearing, S/A Burbridge had been a Special Agent for more than 30 years.  S/A Burbridge was first notified of the Suellentrop matter in March 2017, and received the police reports in April 2017.  After reviewing the reports and the State search warrant, S/A Burbridge determined to seek a federal search warrant.  S/A Burbridge testified that he wanted to make sure he had all of the evidence that was on the phone.  He also testified that he had some concern about whether the cell phone was within the scope of the State-issued search warrant.  On June 20, 2017, S/A Burbridge presented an application and affidavit to the undersigned for a warrant authorizing an examination of Suellentrop's cell phone.  (See E.D. Mo. Case No. 4:17 MJ 1191 JMB)[12]

In general, S/A Burbridge's affidavit summarizes the events of January 1, 2017, as recounted above.  The affidavit omits any direct reference to the fact that Suellentrop's cell phone was examined on behalf of the Jefferson County Sheriff's Department after it was seized on January 1, 2017.  Paragraph 24 of the affidavit states that "Deputy Roberts seized the cellular telephone and no additional examination of was done."  Paragraphs 27 and 28 of the affidavit

---

[12] A copy of the application, affidavit, and warrant was submitted at the evidentiary hearing as Government's Exhibit 14.  A copy of the search warrant return was submitted as Government's Exhibit 15.

reference the State search warrant, and paragraph 29 indicates that "[t]he search did not yield any additional items of evidentiary value relating to sodomy or child pornography."  (Gov't Exh. 14) S/A Burbridge's affidavit and the associated warrant will be discussed in greater detail below.

Suellentrop also testified at the evidentiary hearing.  Suellentrop testified that his parents owned the house at 2566 East Rock Creek Road and that Donnelly did not pay rent to stay there. Suellentrop testified that Donnelly lived in a camper in the driveway and that he did not give Donnelly permission to stay in the house.  Suellentrop testified that Donnelly did not have his permission to use his cell phone.  Rather, he represented that he told Donnelly that Donnelly was not allowed to use his cell phone.  Suellentrop testified that, around Thanksgiving of 2016, he and his parents directed that Donnelly and others were to leave the property.  Suellentrop further testified that Donnelly was not supposed to have his camper on the property, but he acknowledged that he never called the police to have Donnelly or his camper removed.

As explained above, to the extent Suellentrop's testimony conflicted in material respects with Donnelly's testimony, the undersigned credits Donnelly.

Additional findings of fact are included in the discussion below.

## DISCUSSION, CONCLUSIONS OF LAW, & RECOMMENDATIONS

**I.     Motion to Suppress Evidence from Suellentrop's Cell Phone**

Suellentrop seeks suppression of all evidence seized from his cell phone.  First, he contends that any warrantless search of his phone violates the Fourth Amendment per Riley v. California, 134 S. Ct. 2473 (2014).  Second, Suellentrop contends that a State-issued search warrant did not actually authorize any search of his cell phone.  Therefore, any examination of his phone by the Sheriff's Department was warrantless and in violation of the Fourth Amendment.  Third, Suellentrop argues that the subsequent federal search warrant obtained by

the FBI was flawed because the affidavit intentionally or recklessly omitted material information and included material false information.  Thus, Suellentrop argues that he is entitled to a hearing pursuant to <u>Franks v. Delaware</u>, 438 U.S. 154 (1978), and any search conducted by the FBI was also in violation of the Fourth Amendment.

The government offers several reasons why the cell phone evidence is not subject to suppression.  First, the government contends that Paul Donnelly (a private citizen) extinguished Suellentrop's expectation of privacy when Donnelly reviewed some of the photos and a video on the cell phone.  According to the government, law enforcement could review the photos and videos on the phone without a warrant under the private search doctrine.  Second, Detective Poe obtained a State search warrant and any examination of the cell phone should be upheld based on his good faith reliance on that warrant.  Finally, even if the State warrant did not cover the cell phone, any evidence on the cell phone is admissible under the independent source and inevitable discovery doctrines because the FBI obtained a federal search warrant.

### A.    <u>Private Search by Donnelly and Subsequent Law Enforcement Action</u>

Suellentrop argues that the evidence should be suppressed pursuant to <u>Riley v. California</u>, 134 S. Ct. 2473 (2014), which eliminated the routine practice of searching an arrestee's cell phone incident to arrest.  Suellentrop argues that Donnelly lacked permission to be in his residence and to use his cell phone.  Accordingly, the police should not be permitted to make use of the evidence resulting from Donnelly's actions relative to the phone.

"The Fourth Amendment protects the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'"  <u>United States v. Houck</u>, 888 F.3d 957, 959 (8th Cir. 2018) (citing U.S. Const. amend. IV).  A person's private cell phone qualifies as an "effect" for Fourth Amendment purposes.  <u>See</u>, <u>e.g.</u>, <u>Riley</u>, 134 S. Ct.

at 2485.  Suellentrop is correct that, after <u>Riley</u>, the police cannot normally search a cell phone incident to arrest and must normally obtain a warrant.  But the search incident to arrest exception is not at issue in this case—the government does not attempt to justify any warrantless search of Suellentrop's cell phone pursuant to that exception.  Rather, the government contends that the Jefferson County Sheriff's Department was justified in searching Suellentrop's cell phone under the private search doctrine.

While <u>Riley</u> might reasonably influence how the private search doctrine is applied to cell phone evidence, <u>see</u> <u>United States v. Sparks</u>, 806 F.3d 1323 (11th Cir. 2015), <u>Riley</u> did not eliminate the private search exception for cell phones.  The Eighth Circuit has continued to apply the private search exception to cell phone evidence after <u>Riley</u>.  <u>See</u>, <u>e.g.</u>, <u>United States v. Highbull</u>, -- F.3d --, 2018 WL 3322261 (8th Cir. July 6, 2018) (applying private search exception to cell phone suspected of containing images of child exploitation).

Under the private search exception, "[t]he Fourth Amendment … does not extend to private searches that are neither instigated by nor performed on behalf of a governmental entity…. [Rather, the] legality of later government intrusions must be tested by the degree to which they exceeded the scope of the private search."  <u>United States v. Starr</u>, 533 F.3d 985, 994 (8th Cir. 2008) (citing <u>United States v. Miller</u>, 152 F.3d 813, 815 (8th Cir. 1998) (internal quotations omitted)); <u>see</u> <u>also</u> <u>United States v. Jacobson</u>, 466 U.S. 109, 115 (1984); <u>United States v. Goodale</u>, 738 F.3d 917, 921 (8th Cir. 2013), <u>cert.</u> <u>denied</u>, 134 S. Ct. 2856 (2014).  "When the government re-examines materials following a private search, the government may intrude upon an individual's privacy expectations without violating the Fourth Amendment, provided the government intrusion goes no further than the private search."  <u>Starr</u>, 533 F.3d at 995 (citation omitted).  "The private search exception applies 'to a search or seizure, <u>even an unreasonable</u>

one, effected by a private individual not acting as an agent of the Government or with the

participation or knowledge of any governmental official.'" Goodale, 738 F.3d at 921 (quoting

Jacobson, 466 U.S. at 113) (emphasis in Goodale).

Our Court must consider two issues to determine whether the private search exception

applies.  The Court must first decide whether Donnelly was acting as a private citizen or an agent

of the government.  If Donnelly was acting as a private citizen, the Court must next decide the

extent to which the private search exception applies, that is, what evidence is covered by the

exception.  The first issue is easily decided on the facts before the Court.  The second issue is

more nuanced.

In determining whether the private search exception applies, the Eighth Circuit recently

identified the following three factors for determining when a citizen acts as a government agent

in conducting a search:

> [1] whether the government had knowledge of and acquiesced in the intrusive
> conduct; [2] whether the citizen intended to assist law enforcement or instead
> acted to further his own purposes; and [3] whether the citizen acted at the
> government's request….   A defendant bears the burden of proving by a
> preponderance of the evidence that a private party acted as a government agent.

Highbull, 2018 WL 3322261 at *2 (internal quotations and citations omitted).   Applying the

facts developed at the evidentiary hearing to these factors squarely establishes that Donnelly

acted entirely on his own when he searched Suellentrop's cell phone the morning of January 1,

2017.  There is no reason to attribute Donnelly's actions to any government actor.  It does not

matter whether Donnelly lacked permission to use or unlock the phone.  But even if permission

were a factor, the undersigned finds that Suellentrop gave Donnelly permission to use the cell

phone.  Therefore, the private search doctrine applies to Donnelly's search of Suellentrop's cell

phone.

This conclusion, however, does not end the inquiry.  The Court must assess the extent or scope of Donnelly's search because the private search doctrine permits the government to review what Donnelly reviewed, but no more.  Starr, 533 F.3d at 995.  There were numerous images and videos on Suellentrop's cell phone, and Donnelly testified that he did not look at all of the images and videos.  In fact, Donnelly testified that he did not even scroll through all of the thumbnail images.  (Tr. at 17)  Donnelly also testified that he could not clearly make out exactly what the thumbnail images depicted until he clicked on an image and blew it up.  At the evidentiary hearing, the government played a demonstration to depict how Donnelly scrolled through the thumbnail images.  (Gov't Exh. 4)  In addition to scrolling through some of the images, the evidence and testimony from the evidentiary hearing established that Donnelly selected and expanded several images and one video.  In particular, the evidence demonstrated that Donnelly viewed the image and video depicted in Gov't Exhs. 5 and 6.

The government's arguments suggest that Donnelly's private review of some images extinguished Suellentrop's expectation of privacy in all images, thereby permitting law enforcement to review all of the images and videos on Suellentrop's cell phone.  As will be explained below, the undersigned disagrees and finds that the private search in this case extends only to those images that the government proved Donnelly actually could see, which were the images he expanded from thumbnail size and the video he opened and watched.  Stated differently, it is beyond reasonable dispute that Donnelly's actions frustrated any expectation of privacy Suellentrop had in the images and the video that he actually viewed, and law enforcement could look at those images and that video without a warrant.  See Jacobson, 466 U.S. at 109.

Therefore, the issue this Court must resolve, which no party squarely briefed, requires a

consideration of the proper "unit of measurement" for digital evidence in the private search

context.[13]  With images on a cell phone, the unit of measurement could be as narrow as the

specific images and videos enlarged and viewed by the private citizen, or as broad as the entire

cell phone, or somewhere in the middle, such as a photo folder/directory or all thumbnail images

scrolled through.  The government's arguments suggest that, because Donnelly scrolled through

some thumbnail images and specifically viewed several images and one video of suspected child

pornography/abuse, Suellentrop's expectation of privacy in all images was frustrated.  See Gov't

Post-Hearing Brief at 11-22.  Implicit in the government's argument is that the unit of

measurement is at least the entire photograph folder on Suellentrop's cell phone.  The

government's arguments rely heavily on an unreported case from the Eleventh Circuit.  See

United States v. Harling, 705 Fed.Appx. 911 (11th Cir. 2017).   An earlier reported case from the

Eleventh Circuit, however, is more apt and not as favorable to the government's position.

    In United States v. Sparks, 806 F.3d 1323 (11th Cir. 2015), cert. denied, 136 S. Ct. 2009,

137 S. Ct. 34 (2016), the two defendants left a cell phone at a Walmart store.  A Walmart

employee found the phone and made arrangements to return it.  The employee also looked at the

contents of the phone (which was not password protected) and discovered images of child

pornography and contacted law enforcement.  The first Walmart employee showed the images to

another employee by displaying all of the thumbnail images in the album and some full-sized

images.  The images depicted child pornography.  The second employee took the cell phone to

the police.  Sparks, 806 F.3d at 1329-31.  At the police station, the second employee "scrolled

---

[13] See Orin Kerr, Searches and Seizures in a Digital World, 119 Harv. L. Rev. 531, 554
(2005); Orin Kerr, 11th Cir. deepens the circuit split on applying the private search doctrine to
computers, The Volokh Conspiracy Blog (Dec. 2, 2015), available at
http://www.washingtonpost.com/news/volokh-conspiracy/wp/2015/12/02/11th-circuit-deepens-
the-circuit-split-on-applying-the-private-search-doctrine-to-
computers/?noredirect=on&utm_term=.8f70dd97c150 (last visited June 30, 2018).

through the entirety of the album in thumbnail form, pausing several times to show [officers] full-size images."  Id. at 1131.  The officers then gave the cell phone to a detective and showed him some of the images.  The detective then looked at two videos also stored in the same photo album on the phone.  The Walmart employees, however, had only viewed one of the two videos. Id. at 1132.

The district court in Sparks found that the private search conducted by the Walmart employees encompassed the entire digital photo album.  The district court's conclusion rested largely on the fact that the Walmart employees had scrolled through all of the thumbnail images in the photo album in question.  The defendants appealed, arguing that the district court erred as a matter of fact and law.  Id. at 1134-35.  The Eleventh Circuit reversed.  The court noted that the second Walmart employee had scrolled through the entirety of the relevant photo album on the cell phone, at least three times in thumbnail format.  Further, the Walmart employee's testimony "demonstrated that [the employee] was able to discern the images of the photos in the album by reviewing them in thumbnail format."  Id. at 1135.  The evidence also demonstrated that the employee had specifically opened and viewed only one of the two videos.  Id.  The Eleventh Circuit concluded, however, that the detective exceeded the scope of the private search by opening and viewing the second video which no Walmart employee viewed.  In so doing, the court held that by viewing the second video, "[the detective's] review exceeded—not replicated—the breadth of the private search."  Id. at 1336.  In reaching this conclusion, the Eleventh Circuit noted that its ruling was "consistent with the reasoning in Riley v. California …."  Id.

In the absence of any Eighth Circuit precedent to the contrary,[14] the undersigned is

---

[14] The circuits would appear to be split on the issue of the proper unit of measurement

persuaded that <u>Sparks</u> provides an appropriate analytical framework for applying the private search doctrine to the digital images and videos stored on Suellentrop's cell phone.  The undersigned will apply a narrow unit of analysis—on the existing record in this case, the private search extends only to those images and the video that Donnelly actually viewed, not the entire photograph folder and not the entire cell phone.

In making this determination, the undersigned notes that <u>Sparks</u> references two circumstances not supported by the record developed in this case.  First, the evidence developed in <u>Sparks</u> supported a conclusion that the Walmart employees scrolled through <u>all</u> of the thumbnail images in the folder in question.  Here, Donnelly testified that he did not look at all of the thumbnail images.  (Tr. 17)  Second, in <u>Sparks</u>, the evidence supported a conclusion that the employees recognized suspected child pornography in the thumbnail images.  In this case, Donnelly testified that, when the images were thumbnails, he could not "make them all out," and that "the main images were kind of a little blurry at that size until [he] zoomed in on them."  (<u>Id.</u> at 17)  Further, Donnelly testified that he enlarged only some of the thumbnail images and viewed only one video.  (<u>Id.</u>)  Additionally, the undersigned notes that, in the context of a private search, there is a meaningful difference between thumbnail images of photographs and thumbnails of videos.  A thumbnail of a video depicts only one image frame from a larger collection of images, exactly what is contained within the larger collection of images is not displayed.  In contrast, a thumbnail image of a single photograph is essentially just smaller

---

when applying the private search doctrine to digital evidence.  As noted above, the Eleventh Circuit adopted a relatively narrow view in <u>Sparks</u>.  In <u>United States v. Lichtenberger</u>, 786 F.3d 478, 488 (6th Cir. 2015), the Sixth Circuit also adopted a narrow view.  In contrast, the Fifth and Seventh Circuits have applied what appears to be a broader view of the private search doctrine. <u>See</u> <u>United States v. Runyan</u>, 275 F.3d 449 (5th Cir. 2001) and <u>Rann v. Atchison</u>, 689 F.3d 832 (7th Cir. 2012).  <u>Runyan</u> and <u>Rann</u> were decided before the Supreme Court decided <u>Riley</u>, while <u>Sparks</u> and <u>Lichtenberger</u> were decided after <u>Riley</u>.

version of the photograph.[15]

Based on the record in this matter, the undersigned does not agree that the private search doctrine extends to all of the thumbnail images in the photo album/directory on Suellentrop's cell phone.  Although the government established that Donnelly scrolled through many thumbnail images and looked at several larger images, it only proved with specificity that Donnelly looked at the image depicted in Government's Exhibit 5, the video depicted in Government's Exhibit 6, and the images that had penises superimposed on them which were not exhibited.  On this record, the private search exception covers those images but no more.  See Starr, 533 F.3d at 995 (explaining that the government intrusion may go "no further than the private search").

### B.    State-Issued Search Warrant

The government does not rely entirely on the private search doctrine in this case.  It argues that State and federal search warrants also authorized law enforcement to examine the cell phone.

Suellentrop argues that any evidence obtained as a result of the State-issued search warrant must be suppressed.[16]  Suellentrop's position is simple—the State-issued warrant does not cover the cell phone because the warrant fails to mention the cell phone and Suellentrop's phone had already been seized by the time the Det. Poe applied for a warrant.   The government

---

[15] See Orin Kerr, footnote 13 supra.

[16] The images and video viewed by Donnelly and presented to the Jefferson County Sheriff's Department involved at least one image of the victim infant with ejaculate on her face and a video of Suellentrop touching the victim infant's anus and vagina and French kissing the infant.  When interviewed on January 1 and 3, 2017, Suellentrop admitted to making those images and the video, but suggested they were the result of recent acts which he committed in retaliation against his girlfriend for cheating on him.  Suellentrop insisted that he had not penetrated the infant.  The subsequent forensic examinations of Suellentrop's cell phone purportedly uncovered numerous videos of Suellentrop sexually abusing the victim infant which, according to date stamps, occurred months earlier than the images Donnelly reported on January 1, 2017.  (ECF No. 25-1 at 43-48)

argues that the subsequent examination of Suellentrop's cell phone was conducted in reasonable reliance on the warrant.  Thus, any evidence obtained need not be suppressed pursuant to the good-faith exception to the exclusionary rule.

Suellentrop is correct—the State search warrant and Det. Poe's affidavit do not expressly mention searching Suellentrop's cell phone.  Suellentrop is also correct in noting that the warrant was issued after the phone had been seized by police.  The phone itself was removed from the residence by Donnelly before the police arrived.  Thus, Suellentrop contends that any examination of his cell phone conducted after it was seized was conducted in violation of the Fourth Amendment.

When police obtain evidence in violation of the Fourth Amendment, that evidence is ordinarily subject to suppression under the exclusionary rule.  See Houck, 888 F.3d at 959 (citation omitted).  The Supreme Court and the Eighth Circuit have cautioned, however, that suppression does not follow automatically from a Fourth Amendment violation.  See id. at 959-60.  "Instead, the question turns on the culpability of the police and the potential of exclusion to deter wrongful police conduct."  Herring v. United States, 555 U.S. 135, 137 (2009); see also Houck, 888 F.3d at 959-60 (quoting same).  For example, "[the] exclusionary rule does not apply 'when an officer acting with objective good-faith has obtained a search warrant from a judge or magistrate and acted within its scope.'"  United States v. Jackson, 784 F.3d 1227, 1231 (8th Cir. 2015) (quoting United States v. Leon, 468 U.S. 897, 921 (1984)).  See also United States v. Farlee, 757 F.3d 810, 819 (8th Cir.) ("[W]hen assessing the officer's good faith reliance on a search warrant under the Leon good faith exception, we can look outside of the four corners of the affidavit and consider the totality of the circumstances, including what the officer knew but did not include in the affidavit."),  cert. denied, 135 S. Ct. 504 (2014) (citations omitted).

For purposes of deciding Suellentrop's motion to suppress, the undersigned assumes that the State search warrant was defective because it did not expressly refer to the cell phone and the phone had already been removed from the residence.  See Houck, 888 F.3d at 960; cf. United States v. Warford, 439 F.3d 836, (8th Cir. 2006) (considering "the applicability of the good-faith exception to the exclusionary rule" before considering probable cause because, "[i]f the officers acted in good-faith reliance on a warrant, then there is no need to visit the underlying question of probable cause") (citation omitted).  The issue becomes whether law enforcement could reasonably rely on the warrant despite this defect.

The facts and circumstances of Houck are analogous and instructive to Suellentrop's case.  In Houck, a detective determined that a computer IP address at Houck's mother's home was sharing child pornography on a peer-to-peer network.  Another detective applied for and obtained a search warrant for the property.  Prior to applying for the warrant, the detective conducted surveillance and observed a trailer-style RV in the driveway.  "The warrant application included a request to search 'any vehicles … present at the time of execution ….'" 888 F.3d at 958.  The detective "testified that he did not specifically identify the RV in the warrant application or seek a separate warrant to search the RV based on his belief that it fell within the scope of the warrant's authorization to search 'any vehicles.'"  Id.  Law enforcement officers executed the search.  At that time, the RV was not connected to any vehicle, but was connected to water and electric lines.  Ultimately, officers seized a laptop, an iPhone, and an XD picture card from the RV. A forensic preview of the devices indicated that they contained child pornography.  Id.

Houck was charged federally and moved to suppress the evidence seized from his RV and any other evidence as fruit of the poisonous tree.  The district court granted the motion and

the Eighth Circuit reversed that decision.  Id. at 959, 962.  For purposes of review, the Eighth

Circuit assumed that Houck's RV fell outside the scope of the warrant, but "conclude[d] that the

officers made, at most an 'honest mistake' in interpreting warrant to include the RV."  Id. at 960

(citing Maryland v. Garrison, 480 U.S. 79, 87 (1987)).  The Court explained that, in Garrison, the

Supreme Court focused on an officer's reasonableness when searching a property that was not

within the scope of an otherwise valid warrant, noting that "we assess the reasonableness of

officers' actions 'in light of the information available to them at the time they acted,' … and it

emphasized 'the need to allow some latitude for honest mistakes that are made by officers in the

dangerous and difficult process of … executing warrants.'"  Houck, 888 F.3d at 960-61 (quoting

Garrison, 480 U.S. at 85, 87).

        Similarly, when considering the good-faith exception to the exclusionary rule, "[t]he

court must look at the objectively ascertainable question of whether a reasonably well trained

officer would have known that the search was illegal despite a judge's issuance of the warrant."

Jackson, 784 F.3d at 1231 (citations omitted).[17]  "In assessing the objective reasonableness of a

police officer's execution of a warrant, [reviewing courts] must look to the totality of the

circumstances, including any information known to the officer but not presented to the issuing

---

        [17] This good-faith exception to the exclusionary rule does not apply in the following
situations:
                (1) when the affidavit or testimony supporting the warrant contained a false
                statement made knowingly and intentionally or with reckless disregard for its
                truth, thus misleading the issuing judge;
                (2) when the issuing judge "wholly abandoned [the] judicial role" in issuing
                the warrant;
                (3) when the affidavit in support of the warrant is "so lacking in indicia of
                probable cause as to render official belief in its existence entirely
                unreasonable;" and
                (4) when the warrant is "so facially deficient" that no police officer could
                reasonably presume the warrant to be valid.
Jackson, 784 F.3d at 1231 (quoting Leon, 468 U.S. at 923).

judge." <u>Id.</u>

Applying these principles of good-faith and reasonableness to the facts of this case, the undersigned finds that Det. Poe and the Jefferson County Sheriff's Office are entitled to "some latitude for [an] honest mistake[]." <u>Garrison</u>, 480 U.S. at 87; <u>see</u> <u>also</u> <u>Houck</u>, 888 F.3d at 961 (quoting same).

There is no contention that Det. Poe's affidavit is false or that Det. Poe intentionally or with reckless disregard for the truth failed to specifically include the cell phone within the scope of the warrant.  Likewise, there is no reason to suspect that the issuing judge abandoned his judicial role.   Det. Poe's affidavit established more than sufficient probable cause to justify a search of Suellentrop's residence as well as his cell phone.  Thus, the key issue is whether the State search warrant was so facially deficient that no reasonable officer could presume its validity, which in this case includes a question of whether Det. Poe could reasonably conclude that Suellentrop's cell phone fell within the scope of the warrant.

Det. Poe testified that he believed the search warrant covered the cell phone.  The undersigned credits Det. Poe's testimony in this regard and for several reasons finds that Det. Poe's belief was reasonable given the circumstances.  First, it was Det. Poe's intention that the warrant would cover the cell phone, and he testified that he consulted with a Jefferson County prosecutor regarding the scope of the warrant.  In fact, Det. Poe's own actions corroborate his testimony that he believed the warrant covered the cell phone.  Before requesting a warrant, Det. Poe asked Suellentrop for consent to search the home and phone, and Det. Poe included the cell phone on the inventory of items seized when he completed the warrant return form.

Second, the warrant was obtained in unusual circumstances.  The phone had been in Suellentrop's residence earlier on January 1, 2017, but was taken from the residence by a third

party and turned over to the police.  These events, including the warrant application and execution, occurred on a holiday and involved exchanging phone calls and digital communications.  The conduct under investigation, however, involved credible allegations of serious child abuse and sexual exploitation which required prompt attention.

Third, although the warrant itself did not expressly refer to a specific cell phone, the affidavit made clear that Suellentrop's cell phone was at the heart of this investigation, and it established more than sufficient probable cause to search for electronic/digital evidence of child pornography at Suellentrop's residence and on his cell phone.  Det. Poe's affidavit specifically referred to evidence of child pornography being stored on mass storage devices, and the warrant itself commanded law enforcement personnel "to search the computers, cameras, storage devices, and electronic devices seized by you, including any files that are password-protected or encrypted …."  (Gov't Exh. 11)  Det. Poe testified that he intended for that language in his affidavit to cover a cell phone.  (See, e.g., Tr. at 99)

While one might reasonably conclude that it would have been just as easy to include the words "cell phone" in the warrant, no less authority than the United States Supreme Court has recently explained that "[t]he term 'cell phone' is itself misleading shorthand; many of these devices are in fact minicomputers that also happen to have the capacity to be used as a telephone. They could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers."  Riley, 134 S. Ct. at 2489 (also noting the "immense storage capacity" of modern cell phones).  Accordingly, based on the totality of the circumstances, the undersigned finds that a reasonable officer could conclude that the State-issued warrant was valid and included within its scope Suellentrop's cell phone.

In summary, Det. Poe and those examining Suellentrop's cell phone on the basis of the

State-issued search warrant "did not violate [Suellentrop's] Fourth Amendment rights deliberately, recklessly, or with gross negligence."  United States v. Davis, 564 U.S. 229, 240 (2011).  "[W]hen the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, 'isolated' negligence, the 'deterrence rationale loses much of its force,' and exclusion cannot 'pay its way.'"  Id. at 238; see also United States v. Tuton, 893 F.3d 562, 569-70 (8th Cir. 2018) (quoting same).  The purposes of the exclusionary rule would be poorly served in the circumstances of this case.

For the reasons outlined above, the undersigned finds that Det. Poe's reliance on the authority of the State search warrant was objectively reasonable and recommends that Suellentrop's motion to suppress evidence from his cell phone be denied.

### C.        Federal Search Warrant for Suellentrop's Cell Phone

In the alternative, assuming that the evidence obtained as a result of the State-issued warrant is subject to suppression, the Court will address Suellentrop's contention that any evidence obtained pursuant to the federal search warrant must also be suppressed.  In this regard, Suellentrop argues that the affidavit S/A Burbridge submitted with his application for the federal warrant intentionally or recklessly omitted material information and included false information that, if corrected, would deprive the affidavit of probable cause.  As such, Suellentrop requested a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978).

The government contends there was no need for a Franks hearing, and even if the prior State-issued search warrant was defective, this Court need not suppress any evidence as fruit of the poisonous tree because the evidence obtained pursuant to the federal warrant is otherwise admissible under the independent source and inevitable discovery doctrines.

28

### 1.     *Franks – Omitted and False Information*

"The Fourth Amendment requires a showing of probable cause before a search warrant may be issued."  United States v. Williams, 477 F.3d 554, 557 (8th Cir. 2007).  Normally, "[w]hen a magistrate relies solely on an affidavit to issue the warrant, only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause."  United States v. Farlee, 757 F.3d 810, 819 (8th Cir.) (internal quotations and citation omitted), cert. denied, 135 S. Ct. 504 (2014).  In Franks, the Supreme Court explained that, in certain circumstances, the Fourth Amendment entitles a defendant to an evidentiary hearing regarding the accuracy of a search warrant affidavit.  See Franks, 438 U.S. at 155-56.

A defendant is not automatically entitled to an evidentiary hearing under Franks.  "There is … a presumption of validity with respect to the affidavit supporting [a] search warrant." Franks, 438 U.S. at 171.  A defendant's conclusory allegations of false or omitted information are insufficient.  Id.   "In order to be entitled to a hearing under Franks the defendant must make a substantial preliminary showing of a false or reckless statement or omission and must also show that the alleged false statement or omission was necessary to the probable cause determination." United States v. Crissler, 539 F.3d 831, 833 (8th Cir. 2008) (internal citations and quotations omitted).  See also United States v. Gater, 868 F.3d 657, 659-60 (8th Cir.), cert. denied, 138 S. Ct. 751 (2017); United States v. Mashek, 606 F.3d 922, 928 (8th Cir.  2010).  A defendant's substantial "showing is not easily made."  United States v. Engler, 521 F.3d 965, 969 (8th Cir. 2008).  "Allegations of negligence or innocent mistake will not suffice to demonstrate a reckless or deliberate falsehood."  Mashek, 606 F.3d at 928 (citing Franks, 438 U.S. at 171).

Where a defendant argues that the affidavit omitted material facts

the Fourth Amendment requires a hearing where the defendant makes a substantial preliminary showing that (1) the affiant omitted facts with the intent to mislead the issuing judge, or omitted the facts in reckless disregard of the fact that the omissions would mislead, and (2) the affidavit, if supplemented by the omitted information could not support a finding of probable cause.

Gater, 868 F.3d at 659-60 (citing United States v. Conant, 799 F.3d 1195, 1200 (8th Cir. 2015)).

A similar analysis applies to the inclusion of false facts in an affidavit.  See, e.g., United States v. Clapp, 46 F.3d 795, 799 (8th Cir. 1995).  To determine whether statements were made with reckless disregard for the truth, courts consider "whether, after viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." United States v. Butler, 594 F.3d 955, 961 (8th Cir. 2010).   See also Gater, 868 F.3d at 659-60 (omitted facts); United States v. Clapp, 46 F.3d 795, 799 (8th Cir. 1995).

It is not disputed herein that S/A Burbridge's affidavit omitted facts relative to the prior warrant.  The affidavit does not mention that Det. Poe relied on the State-issued search warrant to authorize an examination of the cell phone, it does not mention the additional evidence of child pornography located as a result of the State examinations, and it does not mention any concerns S/A Burbridge had regarding the scope of the State warrant.  Further, one can argue that two paragraphs included representations that, without additional context, can be characterized as false.  In relevant part, paragraph 24 of the affidavit states as follows:  "Deputy Roberts seized the cellular telephone and no additional examination was done…." (Gov't Exh. 14)  Paragraphs 27-28 note that a State search warrant had been issued, but paragraph 29 represents that "[t]he search did not yield any additional items of evidentiary value relating to sodomy or child pornography."  (Id.)  In fact, there was an additional examination of the cell phone which uncovered additional images of evidentiary value.

The gist of the government's position is that S/A Burbridge's affidavit omitted information regarding the prior search warrant so that any information gleaned from the prior warrant and subsequent examination would not taint this Court's probable cause decision.[18]  As for the allegations in paragraphs 24 and 29, the government notes that the facts included in S/A Burbridge's affidavit were intended to convey a timeline of events on January 1, 2017, and not intended to mislead the Court as to the fact that Jefferson County authorities had, in fact, examined Suellentrop's cell phone.  Viewed in the context advanced by the government, the affidavit is arguably accurate.

At the evidentiary hearing, the undersigned concluded that Suellentrop had not met his burden pursuant to Franks.  The omitted and allegedly false information involve facts that the State had already examined the phone and located additional evidence of child exploitation and child pornography beyond that which Donnelly discovered and showed to Dep. Roberts on January 1, 2017.  Based on the record in this matter, the undersigned finds that S/A Burbridge did not present his affidavit with any intention of misleading the Court.  With respect to the allegedly false information, the affidavit is accurate to the extent that it recounts the events of January 1, 2017.  For example, Dep. Roberts observed one image of child pornography when Donnelly showed him the cell phone, then he seized the phone and put it away without further examination.  A similar reading applies to paragraphs 28 and 29, which describe the search of Suellentrop's residence on January 1, 2017.  The search of the residence did not yield any

---

[18] The Sixth Circuit has seemingly approved a similar approach.  In United States v. Bah, 794 F.3d 617 (6th Cir. 2015), officers conducted a warrantless search of a defendant's cell phone incident to an arrest.  Thereafter, an officer applied for a search warrant but omitted the tainted information from the affidavit.  The Sixth Circuit noted, "[b]y omitting the tainted evidence from the warrant affidavit, [the affiant] voluntarily removed—ex ante—the 'illegally determined facts' and permitted the magistrate judge to make an untainted probable cause determination."  Id. at 633-34.  S/A Burbridge followed a similar approach when he applied for a warrant to search Suellentrop's cell phone.

additional evidence regarding sodomy or child exploitation.

Suellentrop contends that S/A Burbridge's affidavit was incomplete and omitted information regarding the prior State-issued search warrant.  In essence, Suellentrop's position is that the State warrant did not cover the cell phone and that, if S/A Burbridge's affidavit included all of the facts regarding the State warrant and prior examinations of the cell phone, this Court would not have issued a federal search warrant.  The problem with Suellentrop's argument is that it conflates the issue of probable cause with the ultimate question of suppression under the fruit of the poisonous tree doctrine.  In issuing a search warrant, which is usually conducted in an ex parte proceeding, a court must decide only whether the affidavit supports a finding of probable cause and describes with particularity both the property to be searched and things to be seized.  See U.S. Const. amend. IV; Dalia v. United States, 441 U.S. 238, 255 (1979); Fed. R. Crim. P. 41(d)(1) ("After receiving an affidavit or other information, a magistrate judge … must issue the warrant if there is probable cause to search for and seize a person or property ….").  Application of the exclusionary rule is normally going to be an issue best addressed with the benefit of a full adversarial process.  Courts are not well-equipped decide ex parte and ex ante whether the evidence likely to be seized as a result of a requested search warrant would later be subject to suppression as fruit of the poisonous tree.[19]  One need look no further than the facts of this case to draw such a conclusion—a determination regarding the admissibility of the cell phone evidence obtained pursuant to the State-issued warrant involved an evidentiary hearing and consideration of complicated, fact-bound issues such as good faith and the circumstances

---

[19] Cf.  United States v. Grubbs, 547 U.S. 90, 99 (2006) ("The Constitution protects property owners not by giving them license to engage the police in a debate over the basis for the warrant, but by interposing, ex ante, the 'deliberate, impartial judgment of a judicial officer … between the citizen and the police,' … and by providing ex post, a right to suppress evidence improperly obtained ….") (quoting Wong Sun v. United States, 371 U.S. 471, 481-82 (1963)).

surrounding the issuance of the warrant.

Even accepting the factual premise of Suellentrop's position—that S/A Burbridge intended to mislead the Court by omitting information regarding the prior State search and examination—including the material omitted information and deleting or correcting the false information would bolster probable cause.[20]  In this regard, one cannot credibly argue that law enforcement lacked probable cause to search Suellentrop's cell phone.  The information from Donnelly, combined with the image Donnelly showed to Dep. Roberts, combined with Suellentrop's statements on January 1, 2017, provided overwhelming probable cause to justify a warrant to search the cell phone.  Adding the omitted facts and correcting or deleting the allegedly false statements would not eliminate probable cause.

Suellentrop failed to show he was entitled to a Franks hearing.

### 2. *Independent Source Doctrine*

The Court next considers whether the evidence obtained pursuant to the federal warrant should be suppressed as fruit of the poisonous tree.  "Under the [Supreme] Court's precedents, the exclusionary rule encompasses both the 'primary evidence obtained as a direct result of an illegal search or seizure' and, … 'evidence later discovered and found to be derivative of an illegality,' the so-called 'fruit of the poisonous tree.'"  Utah v. Strieff, 136 S. Ct. 2056, 2061 (2016) (quoting Segura v. United States, 468 U.S. 796, 804 (1984)) (internal quotations omitted).  The government argues that, even if the prior State-issued warrant did not cover Suellentrop's

---

[20] The following facts would supplement and correct the affidavit for purposes of evaluating Suellentrop's Franks argument:  (1) that Jefferson County authorities examined the cell phone after it was seized on January 1, 2017; (2) that the January 1, 2017, State-issued warrant did not expressly identify the cell phone as a subject of warrant; and (3) that the examination yielded additional evidence of child pornography.  Whether S/A Burbridge personally questioned the scope of the State warrant is not a fact relevant to probable cause in this case, but including such a fact in the affidavit would not eliminate probable cause.

cell phone, the results of the federal examination of the cell phone are admissible pursuant to the independent source doctrine.

"[T]he independent source doctrine allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source." Strieff, 136 S. Ct. at 2061 (citing Murray v. United States, 487 U.S. 533, 537 (1988)); see also United States v. Brooks, 715 F.3d 1069, 1075 (8th Cir. 2013) ("Under the independent source doctrine, the exclusionary rule is inapplicable where the evidence was acquired through a source independent of the tainted search."). A search warrant may serve as an independent source. See United States v. Rodriguez, 834 F.3d 937, 942 (8th Cir. 2016); United States v. Swope, 542 F.3d 609, 613 (8th Cir. 2008). To determine whether a warrant serves as an independent source, "this court asks 'first, would the police have applied for the warrant had they not acquired the tainted information; and second, do the application affidavits support probable cause after the tainted information has been redacted from them.'" Rodriguez, 834 F.3d 937, 942 (8th Cir. 2016) (quoting Swope, 542 F.3d at 613). In this regard, a reviewing court "[g]enerally … may not 'infer from the circumstances that the police inevitably would have sought a warrant; findings of fact by the district court are required.'" Id. (quoting United States v. Leveringston, 397 F.3d 1112, 1115 (8th Cir. 2005)).

The record established at the evidentiary hearing supports a conclusion that the FBI would have applied for a search warrant even if there were no concerns regarding the State-issued warrant. S/A Burbridge testified that, after he received reports from the Jefferson County Sheriff's Department, he determined that he would apply for a federal warrant. When asked why, S/A Burbridge first testified that he wanted to make sure he had "all of the evidence that was inside the phone, you know, extract it…. I wanted all the information that could be obtained

within the phone." (Tr. 125)  As for concerns for the State-issued warrant, S/A Burbidge testified that he did not know for sure whether the phone was covered by that warrant.  (See id.) S/A Burbridge has more than 30 years of experience as a federal agent.  The undersigned had the opportunity to observe S/A Burbridge's demeanor during his direct and cross examination and fully credits his testimony in this matter.

Based on this record, the undersigned finds by a preponderance of the evidence that, once a federal investigation was underway, S/A Burbridge would have applied for a federal warrant, regardless of whether he also harbored concerns as to the scope of the prior State-issued search warrant.  S/A Burbridge testified he wanted to ensure that all of the evidence on the cell phone was extracted.  Thus, the Court need not simply "infer from the circumstances," see Rodriguez, 834 F.3d at 942, that the FBI would inevitably have done once the case was referred to them. Accordingly, the government has met its burden under the first prong of the requisite inquiry under the independent source doctrine.

The government readily satisfies the second prong of the independent source doctrine because the search warrant affidavit S/A Burbridge submitted did not refer to any tainted information.  The affidavit supplies ample probable cause to conclude that evidence of child pornography was located on Suellentrop's cell phone.

In summary, even assuming that the additional cell phone evidence obtained pursuant to the State-issued search warrant must be suppressed, the federal search warrant serves as an independent source.  Therefore, the evidence obtained as a result of the federal search warrant should not be suppressed as fruit of the poisonous tree.

D.      **Alleged Violations of Missouri Law**

In his post-hearing memorandum, Suellentrop briefly refers to alleged violations of his rights under the Missouri Constitution and statutes.  To the extent Suellentrop relies on Missouri law to support his motion to suppress, his reliance is contrary to Eighth Circuit precedent.  In general, evidence is not suppressed for violations of state law absent a violation of the Fourth Amendment, even if the search is executed by state officers.  See United States v. Faulkner, 826 F.3d 1139, 1146 (8th Cir. 2016) (citation omitted), cert. denied, 137 S. Ct. 2092 (2017); see also United States v. Hornbeck, 118 F.3d 615, 617 (8th Cir. 1997).

II.    **Motion to Suppress Statements**

Shortly before the evidentiary hearing in this matter, Suellentrop filed a general motion to suppress statements (ECF No. 33), broadly arguing that any statements he made were not voluntary, were made in violation of his Miranda rights, and were the product of an unlawful arrest.  Suellentrop does not address these issues in his post-hearing memoranda.  For completeness, the undersigned will briefly address Suellentrop's statements.

Suellentrop made statements twice in this matter.  He first made statements on January 1, 2017, after being detained and while seated Dep. Lunsford's official car.  Suellentrop also made statements to Det. Poe on January 3, 2017, while in custody.

Generally, statements made to law enforcement officers during custodial interrogation are subject to the protections and procedures identified in Miranda v. Arizona, 384 U.S. 436, 477-78 (1966).  See United States v. LeBrun, 363 F.3d 715, 720 (8th Cir. 2004) (en banc).  If, after being given Miranda warnings, a defendant agrees to make a statement, the government must show that the waiver was voluntary, knowing, and intelligent for the statement to be admissible.

<u>Colorado v. Connelly</u>, 479 U.S. 157, 169-70, 174 (1986); <u>North Carolina v. Butler</u>, 441 U.S. 369, 373-76 (1979); <u>Miranda</u>, 384 U.S. at 444, 475.  The government has the burden of proving by a preponderance of the evidence that a suspect voluntarily and knowingly waived his <u>Miranda</u> rights, and that the resulting statements were voluntary.  See <u>Connelly</u>, 479 U.S. at 168 (1986); <u>LeBrun</u>, 363 F.3d at 724.  The government has met its burden in this case.

First, based on the information from Donnelly and the image viewed by Dep. Roberts, there was probable cause to arrest Suellentrop on January 1, 2017.  Therefore, there is no credible contention that Suellentrop's arrest was unlawful.  Second, based on the record herein, which included copies of written forms as well as a recording of Suellentrop's statements (Gov't Exhs. 8, 9, 9A, and 10), the undersigned finds that Suellentrop was given appropriate <u>Miranda</u> warnings, understood his rights, voluntarily waived those rights, never requested counsel, and never invoked his right to remain silent.  The record also demonstrates that Suellentrop retained a significant degree of free agency—he refused a request to sign a consent-to-search form and provided cogent reasons for his refusal.  Further, Suellentrop was not threatened, coerced, tricked, or mistreated in any way.  His statements to Jefferson County Sheriff's deputies on January 1, 2017, were voluntary under the law.

The record before the Court also supports a conclusion that Suellentrop's statements to Det. Poe on January 3, 2017, should not be suppressed.  Det. Poe's interview was video and audio recorded.  Det. Poe confirmed that Suellentrop had previously waived his <u>Miranda</u> rights, and Suellentrop has not argued herein that he was entitled to fresh warnings or that his prior waiver of rights was no longer applicable.  At no time did Suellentrop request a lawyer or express a desire to remain silent.  The recording demonstrates that Suellentrop answered Det.

Poe's questions voluntarily and that he was not threatened, coerced, mistreated, or deceived.[21]

The undersigned recommends that Suellentrop's motion to suppress statements be denied.

<u>**CONCLUSION**</u>

For the reasons set forth above, the undersigned respectfully recommends that this Court deny Defendant's Motion to Suppress Physical Evidence.  The undersigned finds that the private search exception applies to the specific images and video that Donnelly identified during the evidentiary hearing, which include Gov't Exhs. 5 and 6 and the images Donnelly viewed that appeared to include superimposed images of penises.  Based on the existing record, however, the private search exception does not extend to all of the images and videos on Suellentrop's cell phone.  The undersigned further finds that Det. Poe's reliance on the State-issued warrant was reasonable under the circumstances.  Therefore, the good-faith exception to the exclusionary rule applies to the cell phone evidence obtained pursuant to that warrant.   Finally, even if the State-issued warrant did not encompass the cell phone evidence, the federal search warrant serves as an independent source of the cell phone evidence in this matter.

The undersigned also respectfully recommends that the Court deny Suellentrop's Motion to Suppress Statements.  Although Suellentrop was questioned twice while in custody, he was given written <u>Miranda</u> warnings, voluntarily waived his rights, and voluntarily answered questions posed to him.

---

[21] Near the beginning of the interview, Suellentrop expressed concern that he might be harmed due to the nature of his alleged crime.  Det. Poe made it clear that he had no desire to harm Suellentrop.  At no point in the video did Suellentrop indicate or suggest that he had, in fact, been mistreated in any way.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Physical Evidence [ECF No. 25] be **DENIED.**

**IT IS FURTHER RECOMMENDED** that Defendant's Motion to Suppress Statements [ECF No. 33] be **DENIED.**

The parties are advised that they have fourteen (14) days in which to file written objections to the foregoing Memorandum, Recommendations, and Order, unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); see also 28 U.S.C. § 636(b)(1)(A), Fed. R. Crim. P. 59(a).

The trial of this matter has been set for Monday, September 17, 2018, at 8:30 a.m., before the Honorable Catherine D. Perry, United States District Judge.

/s/ *John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this  23rd   day of  July , 2018.